

judgment is granted and plaintiff's petition is dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.

---

**L. R. AGUINALDO, Inc., et al.**

v.

**The UNITED STATES.**

No. 48399.

United States Court of Claims.

Oct. 2, 1956.

Martin P. Detels, New York City, for plaintiffs. Watters & Donovan, Charles W. Harvey, and Joseph J. Magrath, 3rd., New York City, were on the briefs.

Melford O. Cleveland, Wilton, Ala., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant. Kendall M. Barnes, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The petition in this case is filed on behalf of the L. R. Aguinaldo, Inc., and seventeen other plaintiffs, including the Honkong & Shanghai Banking Corporation. Only the claim of the Hongkong & Shanghai Banking Corporation is presented to the court at this time. The claims of the other plaintiffs are being held in abeyance until the claims of the Hongkong & Shanghai Banking Corporation have been decided.

All the plaintiffs had an interest in the cargo on board the *S. S. Capillo,* which was destroyed by enemy fire on December 29, 1941.

Plaintiff is a corporation organized under the laws of the Crown Colony of Hongkong, but the laws of that Colony permit citizens of the United States to bring suits against the Crown Colony.

The *S. S. Capillo* was owned by the United States Maritime Commission, but had been chartered to the American Mail Line of Seattle. It sailed from Astoria, Oregon, on or about October 18, 1941, with a cargo consisting principally of flour, canned milk, cigarettes, and lumber. It was scheduled to call at Shang-

hai, Hongkong, Manila, Cebu, and Iloilo, in that order. Just prior to sailing, however, the officials of the American Mail Line, in accordance with the advice of Navy or Coast Guard officials, directed the vessel to proceed first to Honolulu, and from that point on to follow the course prescribed by the Navy.

She arrived in Honolulu on October 27, 1941. The Navy charted her course from thereon by way of the Gilbert and Marshall Islands, Port Moresby, and Torres Strait, and then to Manila. She arrived in Manila on November 28, 1941. Her captain reported to Commander Portz of the United States Navy, who was the Port Captain at Manila, for instructions. She was directed to remain at anchor in Manila Harbor. Her captain requested permission to proceed to Shanghai, but this request was denied, presumably because of fear of her seizure or destruction by the Japanese, who were expected to attack at any time. They did attack on December 7, 1941, about ten days after her arrival in Manila.

In the meantime, her entire cargo remained on board.

Upon the outbreak of war with Japan, she was instructed to go outside the Manila Harbor and anchor. She remained outside the harbor for eight days at various anchorages selected by the master, but on December 16 she returned to the harbor because the crew was becoming unruly.

Upon her return to the harbor, a Navy officer boarded her and advised the captain that the discharge of her cargo was desired as soon as possible. An Army officer also boarded the vessel on the same day and advised the captain that the Army desired the lumber on board the vessel. On the following day lighters operated by the Army came alongside the Capillo at its anchorage, and took off all the lumber on the afterdeck, and about two-thirds of the lumber on the forward deck. This lumber has been paid for and is not involved in this litigation. No cargo, except the lumber, was removed.

On December 25, the Capillo was ordered by the Navy to move to Fort Mills, at Corregidor, which she did, anchoring just off the Fort. The Navy directed the master to move on to Mariveles, on the coast of Bataan, but countermanded this direction on the master's representation that there was a gasoline-laden ship on fire at this place, and there was also adjacent thereto an ammunition dump, which was a tempting target for enemy attack.

Thereafter, the master inquired if there was not some more sheltered anchorage, but was advised that the vessel was as safe where she was as at any other location.

The Port Captain asked the master if he could discharge his cargo on the dock at Fort Mills, but the master replied that the dockside water was too shallow. The Port Captain replied that he would send lighters out to unload the cargo. Before this was done, however, the Capillo was hit by two enemy bombs and set on fire and destroyed.

The master testified that he had requested permission to leave the Manila area on more than one occasion, but that this permission had been refused. Why it was refused, we do not know. It was, of course, the duty of the Navy to regulate the movement of all merchant ships in the way best calculated, in its judgment, to avoid the destruction or capture of the ship and its cargo by the enemy. This may have been the reason for the denial of permission to leave. On the other hand, much of the cargo of this vessel was of military value, and the Navy may have denied permission for her to leave because it wanted her cargo. However, if the latter had been the reason, it would seem she would have been ordered to discharge her cargo shortly after arrival, instead of having been required to remain at anchor in the harbor for about a month.

Whether the vessel would have avoided destruction or seizure by the enemy had she been permitted to leave is of course conjectural, although it is true that other merchant ships in the area had been

permitted to leave, and some had managed to reach safe havens in Australia and elsewhere. At any rate, plaintiff has not shown that the reason for denial of permission to leave was for reasons other than the preservation of the merchant marine of the Nation.

The cargo of the *Capillo* consisted principally, as stated above, of flour, canned milk, cigarettes, and lumber. The lumber was wanted by the military authorities and was removed from the vessel by them, as stated, and the military authorities no doubt wanted to remove at least the flour and the canned milk, and perhaps also the cigarettes, if they could; and had they done so, they would have no doubt appropriated these articles to the use of the Army or Navy. However, they did not remove it, and, hence, there was no actual appropriation of the articles for which the Hongkong & Shanghai Banking Corporation sues.

Refusal of permission to leave the area, under the circumstances then existing, did not amount to a taking. Nor did the later notification by the Port Commander to the master that he would send lighters out to unload the vessel amount to a taking. This is so, even though the vessel's cargo was of definite military value, and probably would have been taken had the Army been able to take it.

Even a definite intention to take her cargo does not amount to a taking, unless the taking is accomplished. If, for instance, the vessel had been loaded with guns and ammunition—of definite military value—and had been ordered alongside the dock for the purpose of discharging her cargo, and then the enemy had come so close that there was not time to discharge it, and the vessel had been ordered to leave, and did leave, and succeeded in getting away, certainly in this case there would have been no taking.

The cargo was not appropriated to the use of defendant; it was destroyed by enemy action. For this defendant is not liable, even though the vessel might have escaped with her cargo, had permission to leave been granted.

The petition will be dismissed as to the claim of Hongkong & Shanghai Banking Corporation.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

**AMERICAN HOME FOODS, Inc. (an Ohio Corporation) and American Home Foods, Inc. (a New Jersey Corporation) in its own right or as transferee of the aforesaid Ohio Corporation**

**v.**

**The UNITED STATES.**

**No. 13-55.**

United States Court of Claims.

Oct. 2, 1956.

